**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0001719
24-AUG-2015
11:41 AM**

NOS. CAAP-13-0001719 and CAAP-13-0002367

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee, v.
VARDAN KAGRAMANY, Defendant-Appellant, and
AKOP TADEVOSOVICH CHANGRYAN, Co-Defendant-Appellant,
and ARAIK DAVTYAN, Defendant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NOS. 11-1-1226 and 11-1-0384)

MEMORANDUM OPINION
(By: Foley, Presiding Judge, Leonard and Ginoza, JJ.)

In this consolidated appeal, Defendants-Appellants

Vardan Kagramany aka Vardan Kagramanyan (**Kagramany**) and Akop

Tadevosovich Changryan aka Hakop Changryan (**Changryan**)

(collectively, **Defendants**) appeal from the June 7, 2013 Judgment

of Conviction and Sentence that was entered against them by the

Circuit Court of the First Circuit (**Circuit Court**)[1] after a jury

found them guilty of Accomplice to Identity Theft in the First

---

[1]     The Honorable Michael D. Wilson presided.

Degree,[2] in violation of Hawaii Revised Statutes (**HRS**) §§ 702-222(1)(b) (2014),[3] 702-221(2)(c) (2014),[4] and 708-839.6 (2014).[5]

I.   BACKGROUND

A.   Factual Background

On August 28, 2010, Changryan and Kagramany traveled from Los Angeles, California to Honolulu, Hawai'i on Delta Air Lines flight 1149, sitting next to each other in seats 34A and 34B. Changryan checked into the Island Colony Hotel on August 31, 2010, where he was seen with Kagramany and some other men entering and exiting the hotel's elevators. Multiple Island Colony Hotel employees later identified Changryan and Kagramany.

---

[2]   The jury found Changryan and Kagramany guilty of both Identity Theft in the First Degree and Accomplice to Identity Theft in the First Degree; however, the Plaintiff-Appellee State of Hawai'i (**State**) proceeded only on the latter charge against both men, and thus the Circuit Court sentenced Changryan and Kagramany for the Accomplice to Identity Theft in the First Degree charge.

[3]   HRS § 702-222(1)(b) states that "[a] person is an accomplice of another person in the commission of an offense if . . . [w]ith the intention of promoting or facilitating the commission of the offense, the person . . . [a]ids or agrees or attempts to aid the other person in planning or committing it[.]"

[4]   HRS § 702-221(2)(c) provides that "[a] person is legally accountable for the conduct of another person when . . . [h]e is an accomplice of such other person in the commission of the offense[.]"

[5]   HRS § 708-839.6 states, in relevant part, the following:

§ 708-839.6 **Identity theft in the first degree.** (1) A person commits the offense of identity theft in the first degree if that person makes or causes to be made, either directly or indirectly, a transmission of any personal information of another by any oral statement, any written statement, or any statement conveyed by any electronic means, with the intent to:

. . . .

(b)   Commit the offense of theft in the first degree from the person whose personal information is used, or from any other person or entity.

(2) Identity theft in the first degree is a class A felony.

2

On September 2, 2010, Changryan rented a van from Simply Storage Hawaii; he returned it on September 4, 2010. A few hours after returning the Simply Storage Hawaii van, Changryan then went to United Truck Rental & Equipment Leasing, Inc. (**United**) and rented a van with outward-swinging, "bifold" side doors.

On the night of September 9, 2010, a white United rental van arrived at the Aloha Island gas station on Kapahulu Avenue, and a man later identified as Kagramany exited the passenger door after the van stopped next to one of the gas pumps. The van's side doors were opened right in front of the gas pump panel, and Kagramany went inside the Aloha Island mini mart before the van eventually left the gas station. Kagramany was later seen on video surveillance footage from the Island Colony Hotel wearing a white-collared shirt with the letters "DKNY" — the same outfit that he was wearing at the Aloha Island gas station. Two hotel employees identified Kagramany as the person in the hotel surveillance footage and associated him with the United van.

On September 11, 2010 at 12:26 p.m., Changryan returned the United van and then, about an hour later, rented a Hyundai Elantra from National Car Rental. He returned the car on September 13, 2010 and subsequently flew back to Los Angeles. Changryan soon returned to Hawai'i and, on September 23, 2010, he rented another van from United, again with outward-swinging, "bifold" side doors.

Later that night, the United van was seen on video surveillance at two Aloha Island gas stations. First, at 9:40 p.m., the van entered the Aloha Island gas station on Kalakaua Avenue and stopped beside one of the gas pumps. The van's side-door windows had a foil-like covering on them. A man later identified as Kagramany exited the passenger door, and the driver positioned the van so that it aligned the side doors with the gas pump panel. The driver then repositioned the van at another pump at the same gas station, and Kagramany went into the mini mart and purchased a roll of tape. He returned to the van with the tape, and shortly thereafter, the van left the gas station.

The United van then entered the Aloha Island gas station on Kapahulu Avenue at 10:49 p.m., stopping at the same pump that it had on September 9, 2010. Again, Kagramany exited the passenger door, and after the driver had aligned the van's side doors with the gas pump, the side doors were opened. Kagramany then stood by the open hood of the van for several minutes before the van eventually left the gas station.

A few hours later, at 12:20 a.m. on September 24, 2010, the United van returned to the Aloha Island gas station on Kalakaua Avenue and pulled up to a different gas pump. Kagramany walked around from the rear of the van, appeared to open the side doors, and placed the gas nozzle into the van's gas tank. When the side doors closed, Kagramany removed the gas nozzle from the tank and the van subsequently exited the gas station. Later that morning, Changryan returned the van to United, and on September 26, 2010 he checked out of the Island Colony Hotel, paying in

cash. He and Kagramany then flew back to Los Angeles on Delta Air Lines flight 1150, again sitting next to each other.

Between September 23, 2010 and November 3, 2010, the Bank of Hawaii received multiple customer reports of unauthorized ATM withdrawals in the Los Angeles area, even though the customers all still had possession of their bank cards. Hawaii State Federal Credit Union (**FCU**), Central Pacific Bank, American Savings Bank, Hawaiian Tel FCU, and First Hawaiian Bank all received similar customer reports. In total, the banks lost a total of $157,654.56, and the unauthorized transactions affected a total of 199 accounts. The banks collectively identified the Aloha Island gas stations on Monsarrat Avenue, Kapahulu Avenue, Kalakaua Avenue, School Street, and North King Street as the locations where the customers' personal information was most likely compromised during September 2010.

United States Secret Service Special Agent Travis Taylor (**Special Agent Taylor**) was assigned to investigate the matter, and on September 29-30, 2010, he and Richard North (**North**), the Director of Information Technology at Aloha Petroleum, visually inspected the interior and exterior of the gas pumps at the Aloha Island gas stations on Monsarrat Avenue, Kalakaua Avenue, Kapahulu Avenue, and North King Street. They failed to find any skimming devices[6] at the time of inspection or

---

[6] Special Agent Matthew Mitchell testified that "[s]kimming refers to the covert and fraudulent capturing of credit card track data, or debit card information." A skimming device is basically "a magnetic strip reader" that can come in "various shapes and sizes," and it usually consists of "a very small circuit board." These devices may be installed on gas pumps (externally or internally), and the device connects to the card reader located inside the gas pump. Once connected to the pump, it can capture and record
(continued...)

any evidence of tampering with the gas pumps. North did testify, however, that the front panels of the pumps are secured with "generic" locks and keys and that "there are literally hundreds on the island." Special Agent Taylor concluded that "based on the investigation here, the only logical explanation is that they put, installed, a[n] internal skimmer."[7]

Special Agent Taylor also testified that he obtained the records for Changryan's JP Morgan Chase account. The account records showed $3,590 in deposits for the period of August 24 to September 23, 2010, and then $7,224 the following month and $12,038 the month after that.

B.    Procedural History

On September 6, 2011, a grand jury indicted Changryan and Kagramany on one count each of Identity Theft in the First Degree (**Counts 1 and 3**), in violation of HRS § 708-839.6(1)(b); one count each of Accomplice to Identity Theft in the First Degree (**Counts 2 and 4**), in violation of HRS §§ 702-222(1)(b), 702-221(2)(c), and 708-839.6; and one count of Criminal

---

[6] (...continued)
credit and debit card information as it is being transmitted from a card reader to a financial institution. After installation, the skimming device is removed and any captured data is downloaded "onto any type of digital device," which is "[m]ost commonly[] a laptop." The information can then be "sold in underground black markets" or the "track data [can be] re-encoded" by transferring the data onto another card that contains a magnetic strip reader (*i.e.*, gift cards, other debit or credit cards, etc.).

[7]     Special Agent Taylor explained that "[a] skimming device is any type of device that is used to capture the information that's contained on the back of a credit card, along the magnetic strip." He testified that there are "several different types," including external and internal skimmers, and he stated that internal ones "are a little bit more complex because it requires somebody to physically get inside the machine or device and install the skimmer inside there."

Conspiracy to Commit Identity Theft in the First Degree (**Count 7**), in violation of HRS §§ 705-520 (2014)[8] and 708-839.6.[9]

On January 14, 2013, Kagramany filed three motions to dismiss the three counts against him, asserting that the charges were "fatally insufficient and must be dismissed" because of a failure to contain the states of mind of "intentionally, knowingly, or recklessly," pursuant to HRS § 702-204 (2014).[10] On January 24, 2013, the State filed opposition memoranda to Kagramany's motions to dismiss, arguing that the charges did actually contain the applicable state of mind and that the motions should therefore be denied. On January 28, 2013, Changryan joined in Kagramany's motions to dismiss, as applied to the specific counts charged against him. The Circuit Court held

---

[8]     HRS § 705-520 provides:

> **§ 705-520  Criminal conspiracy.**  A person is guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a crime:
>
> > (1)     He agrees with one or more persons that they or one or more of them will engage in or solicit the conduct or will cause or solicit the result specified by the definition of the offense; and
> >
> > (2)     He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

[9]     The grand jury also indicted Araik Davtyan (**Davtyan**) with the same offenses; however, Davtyan entered a plea of no contest to Conspiracy to Commit Identity Theft in the Third Degree in conjunction with a motion for deferred acceptance of no contest.

[10]     HRS § 702-204 provides:

> **§ 702-204  State of mind required.**  Except as provided in section 702-212, a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense. When the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly.

a hearing on February 5, 2013, and ultimately denied the motions, stating that "the indictment does sufficiently identify the state of mind[,]" as it was "clear . . . with the use of the term 'intent' within the indictment."

On February 12, 2013, Changryan filed motions *in limine* to exclude (1) evidence related to "bad acts" under Hawaii Rules of Evidence (**HRE**) 404,[11] including "[a]ny reports or allegations of similar, prior or subsequent criminal acts or related misconduct" and (2) "any unfavorable evidence which may not technically be considered 'bad acts' . . . [which should] be excluded as irrelevant under HRE 402[12], or as unfairly

---

[11] HRE Rule 404 states, in relevant part:

> **Rule 404 Character evidence not admissible to prove conduct; exceptions; other crimes.**
>
> (a) Character evidence generally. Evidence of a person's character or a trait of a person's character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
> > (1) Character of accused. Evidence of a pertinent trait of character of an accused offered by an accused, or by the prosecution to rebut the same;
>
> > . . . .
>
> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

[12] HRE Rule 402 provides:

> **Rule 402 Relevant evidence generally admissible; irrelevant evidence inadmissible.** All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the State of Hawaii,

(continued...)

prejudicial under HRE 403[13]." On February 13, 2013, the Circuit Court held a hearing on Changryan's motions *in limine*. During the hearing, the Circuit Court heard arguments about the State showing a picture of a skimming device to the jury, but reserved ruling on the matter. Also during the hearing, Changryan orally moved for an order precluding the State from "offering police officers and/or sheriffs from L.A. identifying photographs" and indicating that Changryan was in those photographs. The court stated that it would take the matter "under consideration." Kagramany joined in this motion *in limine*.

The jury trial commenced on February 13, 2013. Following the State's case-in-chief, Changryan and Kagramany moved for a judgment of acquittal; the Circuit Court denied this motion. Both Changryan and Kagramany elected not to testify. Following the conclusion of the trial, the jury found Changryan and Kagramany guilty as charged in Counts 1 through 4. At sentencing, the State elected to proceed on Counts 2 and 4, Accomplice to Identity Theft in the First Degree, due to the

---

[12](...continued)
> by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible.

[13]    HRE Rule 403 provides:

> **Rule 403  Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

requirements of HRS § 701-109 (2014).[14] The Circuit Court sentenced Changryan and Kagramany each to a twenty-year term of imprisonment for Counts 2 and 4, respectively; it also entered a free-standing order of restitution, with the co-defendants having joint and several liability, in the amount of $157,654.56. Changryan and Kagramany timely filed notices of appeal.

II. <u>POINTS OF ERROR</u>

Changryan and Kagramany raise the following points of error on appeal:

(1) the Circuit Court erred in denying Changryan's and Kagramany's motions to dismiss Counts 1 through 4 of the indictment for failure to specify the applicable states of mind for the charged offenses;

---

[14] HRS § 701-109 states, in relevant part:

> **§ 701-109 Method of prosecution when conduct establishes an element of more than one offense.**
>
> (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:
>
> (a) One offense is included in the other, as defined in subsection (4) of this section; or
>
> (b) One offense consists only of a conspiracy or solicitation to commit the other; or
>
> (c) Inconsistent findings of fact are required to establish the commission of the offenses; or
>
> (d) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct; or
>
> (e) The offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses.
>
> . . . .

(2) the Circuit Court erred in denying Kagramany's motion for judgment of acquittal and in convicting Changryan and Kagramany because there was no substantial evidence to support their convictions;

(3) the Circuit Court erred in allowing the State to present evidence and testimony regarding skimming devices where the State failed to establish that such testimony and evidence was relevant and admissible;

(4) the Circuit Court abused its discretion in failing to hold a HRE Rule 104[15] hearing prior to allowing the State's law enforcement witnesses to testify;

(5) the Circuit Court abused its discretion in allowing the State's law enforcement witnesses to testify that

---

[15] HRE Rule 104 states the following:

**Rule 104 Preliminary questions.** (a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (b). In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

(b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

(c) Hearing of jury. Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require or, when an accused is a witness, if the accused so requests.

(d) Testimony by accused. The accused does not, by testifying upon a preliminary matter, subject oneself to cross-examination as to other issues in the case.

(e) Weight and credibility. This rule does not limit the right of a party to introduce before the jury evidence relevant to weight or credibility.

they were familiar with Changryan and Kagramany and that they had prior contact with the two men, as that evidence constituted inadmissible prior bad act evidence;

(6) the Circuit Court abused its discretion in allowing the State's law enforcement witnesses to offer lay opinion testimony that the individuals in photographs and videos were Changryan and Kagramany; and

(7) the Deputy Prosecuting Attorney's (**DPA's**) comments during closing argument constituted prosecutorial misconduct.

III. APPLICABLE STANDARDS OF REVIEW

"Whether a charge sets forth all the essential elements of a charged offense is a question of law, which we review under the de novo, or right/wrong, standard." State v. Mita, 124 Hawai'i 385, 389, 245 P.3d 458, 462 (2010) (citation, internal quotation marks, ellipsis, and brackets omitted).

Appellate courts review the sufficiency of evidence on appeal as follows:

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Richie, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (quoting State v. Quitog, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)). "'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (citation and internal

quotation marks omitted). Additionally, "it is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." State v. Martinez, 101 Hawaiʻi 332, 340, 68 P.3d 606, 614 (2003) (citations, internal quotation marks, and brackets omitted).

The appellate court applies "two different standards of review in addressing evidentiary issues." State v. Ortiz, 91 Hawaiʻi 181, 189, 981 P.2d 1127, 1135 (1999) (citation and internal quotation marks omitted). "Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." Id. (citations and internal quotation marks omitted).

A trial court's determinations concerning relevance under HRE Rules 401[16] and 402 are reviewed under the right/wrong standard. See State v. St. Clair, 101 Hawaiʻi 280, 286, 67 P.3d 779, 785 (2003) ("A trial court's determination that evidence is 'relevant' within the meaning of HRE Rule 401 . . . is reviewed under the right/wrong standard of review."); State v. Duncan, 101 Hawaiʻi 269, 274, 67 P.3d 768, 773 (2003) ("[E]videntiary rulings concerning relevance under HRE Rule 402, inasmuch as the application of the rule can only yield one correct result, are reviewed under the right/wrong standard.").

---

[16] HRE Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

"With respect to HRE Rule 403, which requires a judgment call on the part of the trial court, the appropriate standard of review on appeal is abuse of discretion." Duncan, 101 Hawai'i at 274, 67 P.3d at 773 (citations, internal quotation marks, and brackets omitted).  "An abuse of discretion will be found where the trial court clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." Id. (citation and internal quotation marks omitted).

"In Hawai'i, admission of opinion testimony is a matter within the discretion of the trial court, and only an abuse of that discretion can result in reversal." State v. Toyomura, 80 Hawai'i 8, 23-24, 904 P.2d 893, 908-09 (1995) (quoting State v. Tucker, 10 Haw. App. 73, 89, 861 P.2d 37, 46 (1993)) (internal quotation marks and brackets omitted).

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999) (citations and internal quotation marks omitted).  Appellate courts thus "will not overturn a defendant's conviction on the basis of plainly erroneous prosecutorial misconduct . . . unless there is a reasonable possibility that the misconduct complained of might have contributed to the conviction." State v.

Rodrigues, 113 Hawai'i 41, 47, 147 P.3d 825, 831 (2006) (citations and internal quotation marks omitted).

"Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." State v. McGriff, 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994) (citations omitted). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [appellate courts] consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." State v. Agrabante, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992) (citations omitted).

IV. DISCUSSION

A. Defendants' Motions to Dismiss

Defendants argue that the Circuit Court erred in denying their motions to dismiss Counts 1 through 4 for failure to specify the applicable states of mind for the charged offenses.[17] They argue that the Accomplice to Identity Theft in the First Degree charge is "fatally defective" because no states of mind preceded the conduct element of the offense (i.e., "aid or agrees or attempts to aid in the planning of or the commission

---

[17] Because the State elected to proceed solely on Counts 2 and 4 in the indictment, the Accomplice to Identity Theft in the First Degree charge, and because the Defendants were only actually sentenced for Counts 2 and 4, we will only address the Accomplice to Identity Theft in the First Degree charge because the arguments pertaining to Counts 1 and 3 are moot. See In re Doe, 102 Hawai'i 75, 77, 73 P.3d 29, 31 (2003) (explaining that "the mootness doctrine is properly invoked where events have so affected the relations between the parties that the two conditions for justiciability relevant on appeal—adverse interest and effective remedy—have been compromised" (citations, internal quotations marks, and ellipsis omitted)).

15

of"). In their briefs, Defendants cite authorities for the proposition that the indictment must sufficiently state an offense (see State v. Nesmith, 127 Hawaiʻi 48, 52, 276 P.3d 617, 621 (2012)) and must "enable a grand jury to determine that probable cause exists that the accused committed a violation of the charged offense both as to the elements of the offense and the concomitant culpable state of mind." See State v. Stan's Contracting, 111 Hawaiʻi 17, 31-32, 137 P.3d 331, 345-46 (2006). They also cite to HRS § 702-204, which states that "[w]hen the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly." Thus, Defendants argue, because HRS § 702-222(1)(b) does not specify a state of mind for the conduct element, the state of minds listed in HRS § 702-204 should have been included in the charge.

However, HRS § 702-204 relates to the state of mind required for a defendant to be guilty of an offense; it does not require that an indictment contain the "intentionally, knowingly, or recklessly" language when the statute defining the offense is silent. In fact, HRS § 806-28 (2014) states that "[t]he indictment need not allege that the offense was committed or the act done 'feloniously', 'unlawfully', 'wilfully', 'knowingly',

'maliciously', 'with force and arms', or otherwise except where such characterization is used in the statutory definition of the offense."[18]

Further, "[i]n general, '[w]here the statute sets forth with reasonable clarity all essential elements of the crime intended to be punished, and fully defines the offense in unmistakable terms readily comprehensible to persons of common understanding, a charge drawn in the language of the statute is sufficient.'" State v. Wheeler, 121 Hawai'i 383, 393, 219 P.3d 1170, 1180 (2009) (quoting State v. Jendrusch, 58 Haw. 279, 282, 567 P.2d 1242, 1245 (1977)). Here, the charges in Counts 2 and 4 were drawn from the language of HRS § 702-222(1)(b). The statute and the charge both set forth, with reasonable clarity, all essential elements of the crime.[19] Specifically, the state of mind for accomplice liability under HRS § 702-222(1)(b), which uses the word "intention," has been construed to require proof that "the defendant had the *intent* to promote or facilitate the commission of [the crime]." State v. Brantley, 84 Hawai'i 112, 121, 929 P.2d 1362, 1371 (App. 1996) (emphasis added) (footnote and internal quotation marks omitted). The Indictment charged

---

[18]     Note that the Hawai'i Supreme Court has clarified that HRS § 806-28 applies only to circuit, not district, courts. Nesmith, 127 Hawai'i at 58, 276 P.3d at 627. Subsequently, the supreme court has relied on Nesmith to dismiss District Court cases where HRS § 702-204 required that the defendant act "intentionally, knowingly, or recklessly" but such language was not included in the indictment. See e.g., State v. Maharaj, 131 Hawai'i 215, 219, 317 P.3d 659, 663 (2013); State v. Gonzalez, 128 Hawai'i 314, 324, 288 P.3d 788, 798 (2012). However, the holdings of Nesmith and its progeny are distinguishable to the present case which took place in Circuit Court.

[19]     Note that, although mens rea is not an element of a crime, it is nonetheless an essential fact that must be proved to convict a defendant of a crime, and thus, a defendant should be notified of the mens rea requirement he or she would be required to defend against to avoid a conviction. Nesmith, 127 Hawai'i at 55-56, 276 P.3d at 624-25.

that the Defendants, "with the intention of promoting or facilitating the commission of the offense of Identity Theft in the First Degree, did aid or agree or attempt to aid in the planning of or the commission of the offense[.]" The word "intent" has been construed to refer to the state of mind of "intentionally." See e.g., State v. Cabrera, 90 Hawaiʻi 359, 369, 978 P.2d 797, 807 (1999) (explaining that "insofar as HRS § 708-830(8)(a) expressly recites that 'intent to defraud' . . . is the state of mind requisite to the commission of theft by 'shoplifting,' and in light of HRS § 702-207 . . . it would follow . . . that the 'intentional' state of mind attaches to all of the elements of the offense, including the attendant circumstance of the value of the property taken") (some internal quotation marks omitted). Thus, we conclude that the Indictment sufficiently informed Defendants of the mental state they would need to defend against. In the context of the charge, aiding, agreeing, or attempting to aid in the planning and commission of the offense could only be an intentional act. Thus, we conclude that the Circuit Court did not err by denying Defendants' motions to dismiss.

   B.   The Motion for Judgment of Acquital

Defendants argue that they should have been acquitted because there was no substantial evidence to support their convictions. Specifically, Changryan argues that "there was no direct evidence that established that the [Aloha Island gas station] locations were the 'point of compromise.'" He also contends that the assumption that the Aloha Island gas stations

18

were the "point of compromise" was "contradicted by the fact that the stolen information was used at ATMs prior to the time when the [skimming] devices were supposedly removed from the pumps [on September 23, 2010]." In addition, Kagramany contends that:

> while there was evidence regarding deposits made into Changryan's account, there was no similar evidence regarding Kagramany. . . . Basically, the only evidence regarding Kagramany . . . was that he had flown to Hawai'i with Changryan, that they had stayed at the Island Colony and that he had been in the vans rented by Changryan at the gas stations.

Both Defendants contend that there was no evidence that either of them possessed items such as "illicit debit cards", skimming devices, or any of the financial information of the victims. Defendants also argue that there was no direct evidence that a skimming device was used, and the conclusion that such a device was used was based on mere speculation.

We conclude that there was substantial evidence to support the conclusion that Defendants committed the crime of Accomplice to Identity Theft in the First Degree, which requires that one intentionally "[a]ids or agrees or attempts to aid" another person "in planning or committing" identity theft (i.e., making or causing "a transmission of any personal information . . . with the intent to . . . [c]ommit the offense of theft in the first degree from the person whose personal information is used, or from any other person or entity"). See HRS § 702-222(1)(b); HRS § 708-839.6.

First, there was substantial evidence that the Aloha Island gas stations in question were the "points of compromise". The State adduced, *inter alia*, evidence showing that between September and November of 2010, multiple Hawai'i banks received

19

customer reports of unauthorized ATM withdrawals in the Los Angeles Area, despite the fact that these customers still had possession of their bank cards.  The banks were able to identify the Aloha Island gas stations on Monsarrat Avenue, Kapahulu Avenue, Kalakaua Avenue, School Street, and North King Street as the most likely locations where the customers' personal information was compromised during September 2010.

Changryan's argument that stolen information was used prior to September 23, 2010, the date that the Defendants allegedly removed the skimming devices, does not preclude the conclusion that the gas stations were the point of compromise. This contention appears to be based on the banks' submitted records, which show that unauthorized ATM withdrawals were made in California as early as September 13, 21, and 22, 2010. Special Agent Taylor agreed that "the info on the skimmer can't be used until the skimmer is removed."  Thus, he opined that a "test skimmer" could have been used and that Changryan had taken it back with him to California when he left Hawai'i on September 13, 2010.  Although there was no direct evidence that anyone returned to the pumps to collect a "test skimmer", the fact that September 13, 2010 was the date that Changryan returned to Los Angeles as well as the earliest date that fraudulent ATM transactions occurred in California supports Special Agent Taylor's theory.

Kagramany's argument that there was no evidence that he, in contrast with Changryan, received any proceeds from the alleged scheme is unavailing.  Even assuming that there is no

evidence that Kagramany directly profited from the scheme, he was properly convicted as an accomplice based on the evidence that he aided or agreed or attempted to aid Changryan in the commission of First Degree Identity Theft.

To prove that they were accomplices, the State presented a multitude of evidence showing that Changryan and Kagramany were associated with each other.  For example, the State showed that the Defendants traveled together from Los Angeles to Honolulu and back, and that the Defendants were residing together at the Island Colony Hotel for a period of a few weeks.  Multiple Island Colony Hotel employees were able to identify Changryan and Kagramany.  Furthermore, the State presented evidence that the Defendants were involved in renting white United rental vans on several occasions, as revealed by the fact that the vans were taken out in Changryan's name and that Kagramany was seen multiple times on gas station surveillance videos entering and exiting the United vans and was connected to the vans by Island Colony hotel staff.

Finally, the State adduced myriad evidence pointing to the fact that the Defendants aided in making or causing an unauthorized transmission of personal information.  This is revealed through the various incidents occurring on September 9, 23, and 24, 2010, in which the United rental vans rented by the Defendants made stops at various different Aloha Island gas stations around Honolulu, going to different pumps (sometimes multiple pumps per location) and aligning the van's side doors with the gas pump panels for several minutes before moving on to

the next location.  When coalesced with the other evidence regarding the Defendant's activities and the information pertaining to the unauthorized ATM withdrawals, the video surveillance from the different Honolulu Aloha Island gas stations constitutes substantial circumstantial evidence of the charged offenses.  See State v. Batson, 73 Haw. at 236, 249, 831 P.2d at 924, 931 (1992) (explaining that the trier of fact is "free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence" (citation omitted)).  "No greater degree of certainty is required where a conviction is based solely on circumstantial evidence rather than on direct evidence."  State v. Bright, 64 Haw. 226, 228, 638 P.2d 330, 332 (1981).  Viewing this evidence in the strongest light for the State, we conclude that the State adduced substantial evidence enabling a reasonable person to conclude that the Defendants were guilty of Accomplice to Identity Theft in the First Degree.  See Richie, 88 Hawai'i at 33, 960 P.2d at 1241. Therefore, the Circuit Court did not err when it denied Kagramany's motion for judgment of acquittal.

C.   The Evidence and Testimony Re:  Skimming Devices

Defendants argue that the Circuit Court erred in allowing the State to present evidence and testimony regarding skimming devices because the State failed to establish that such testimony and evidence was relevant and admissible. Specifically, they argue that such evidence of skimming devices was not relevant and admissible because "[n]o skimming devices were found and there was no evidence that the gas pumps had been

tampered with or that skimming devices had ever been installed in the pumps."

However, Defendants failed to properly preserve their argument for appeal. During the hearing on their motion *in limine*, Changryan's counsel argued:

> [T]here may not have been a specific mechanical device attached to that credit card - I mean gas tanks involved in this case. And there was none found. So for the State to argue, well, these experts are going to come in and show that these kinds of devices can be used, the problem is that none were recovered. So they're making an inference or they're making a speculation that this in fact this device they've taken a picture of was used specifically in this instance.

Rather than granting or denying Defendants' motion with respect to the skimming device evidence, the Circuit Court stated that it would "take under consideration the issue."

When a trial court denies a party's pretrial motion *in limine*, that party must object to the proffered evidence during trial to preserve the issue for appeal. Kobashigawa v. Silva, 129 Hawai'i 313, 322, 300 P.3d 579, 588 (2013). The exception is when the ruling on the motion *in limine* is definitive;[20] in such a case, further objections are unnecessary to preserve the issue for appeal. Id. "As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal[.]" State v. Moses, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003).

Here, the Circuit Court did not definitively rule that evidence on skimming devices would be admissible. Kagramany's

---

[20] "A trial court's ruling on a motion in limine is definitive when it leaves no question that the challenged evidence will or will not be admitted at trial." Kobashigawa, 129 Hawai'i at 329, 300 P.3d at 595 (citations, internal quotation marks and brackets omitted).

counsel asserts that the objection was renewed during the testimony of North and Special Agent Taylor.[21]  However, these objections were made after Special Agent Mitchell had already given extensive testimony on skimming devices without objection. Generally, "evidence to which no objection has been made may properly be considered by the trier of fact and its admission will not constitute grounds for reversal."  State v. Samuel, 74 Haw. 141, 147, 838 P.2d 1374, 1378 (1992).

Even assuming, arguendo, that the objections were properly renewed, the Circuit Court did not err in allowing evidence regarding skimming devices.  HRE Rule 402 provides the following:  "All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the State of Hawaii, by statute, by these rules, or by other rules adopted by the supreme court.  Evidence which is not relevant is not admissible."  HRE Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Thus, "the relevance inquiry requires a two-step analysis: (1) is the fact for which the evidence is proffered of consequence to the determination of the action; and (2) does the proffered evidence tend to alter the probability of that fact." State v. Kupihea, 80 Hawaiʻi 307, 315, 909 P.2d 1122, 1130 (1996) (internal quotation marks omitted).

---

[21]     Changryan's brief fails to point out where in the record the skimming evidence was objected to when it was offered, which violated Hawaiʻi Rules of Appellate Procedure (**HRAP**) Rule 28(b)(4).

The evidence and testimony regarding skimming devices was clearly relevant.  The evidence was offered to explain and provide background as to how the transmission of personal information could have occurred through the use of a skimming device and how this could be possible even though no device was found.  This was "of consequence to the determination of the action" because it revealed that it was possible for the Defendants to have committed the crime, and it revealed how this crime likely occurred, given the strong circumstantial evidence in the case.  The skimming device evidence also made it more probable that the Defendants committed the crime using some type of skimming device because it provided the jury with background and an explanation as to how these devices typically work and how the use of such a device was consistent with the evidence in this case.  See HRE Rule 401.  Therefore, the skimming device evidence was relevant and admissible under HRE Rules 401 and 402.

Defendants also argue that evidence was inadmissible under HRE Rule 403 because "the misleading and speculative testimony/evidence regarding skimming devices was far more prejudicial than probative."  HRE Rule 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  According to the Hawai'i Supreme Court, "unfair prejudice means an undue tendency to suggest a decision on an improper basis, commonly, though not

necessarily, an emotional one." State v. Behrendt, 124 Hawai'i 90, 120, 237 P.3d 1156, 1186 (2010) (citations, internal quotation marks, and brackets omitted).

We conclude that the Circuit Court did not abuse its discretion in determining that the probative value of this evidence was not substantially outweighed by any risk of unfair prejudice or other danger under HRE Rule 403. First, the probative nature of this evidence was high, given the evidence of Defendants' activities and the nature of the allegations. In addition, the risk of unfair prejudice in this case appears rather low because the evidence regarding skimming devices is not the type that would inflame the passions of the jury on an emotional basis as it simply explained the mechanics of how personal information could have been captured at the gas pumps. Additionally, any risk of prejudice was mitigated by the Circuit Court's limiting instruction prior to the jury being shown a picture (for demonstrative purposes) of a skimming device.[22] Given the lack of any indication to the contrary, we presume that the jury followed the Circuit Court's instructions. State v. Knight, 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996) (stating that "as a rule, juries are presumed to follow all of the trial

---

[22] The Circuit Court's limiting instruction stated the following:

Ladies and gentlemen, I'm going to give you a limiting instruction at this time, pertaining to the exhibit that's going to be provided to you, as a demonstrative exhibit. And that is a picture of a skimming device.
You are instructed that the use of this photograph is only to aid in the testimony being given by the witness to explain what a skimming device is, and is not to be considered by you as the skimming device used in this case, or any skimming device that might have been used in this case.

court's instructions.") (citation, internal quotation marks, ellipsis, and brackets omitted). Accordingly, we conclude that the Circuit Court did not abuse its discretion in admitting the skimming device evidence under HRE Rule 403.

D.     The HRE Rule 104 Issues

HRE Rule 104 provides that preliminary questions of admissibility "shall be determined by the court" and that hearings on preliminary matters shall be conducted out of the hearing of the jury "when the interests of justice require" it. Changryan asserts that the Circuit Court abused its discretion in failing to hold a Rule 104 hearing prior to allowing the State's law enforcement witnesses[23] to testify concerning the identification of the Defendants. Specifically, he states that the error occurred when "the defense requested a HRE Rule 104 hearing during [Changryan's] oral motion in limine to preclude the testimony of the State's witnesses[,]" and the "witnesses testified without 104 hearings being conducted." However, the court did not reject his request at the hearing on his motion *in limine*, but rather, instructed counsel for the Defendants to have a discussion with the DPA, stating that if after the discussion, "you question whether there's a sufficient basis to trust their identification, we can have the 104 hearing. I'll just wait to hear from you later as to whether you want to have the 104 hearing."

_____

[23]     The law enforcement witnesses whose testimony Changryan objects to are "Detective Bammer, Agent Mitchell, Sergeant Quintero and Detective Meyer." Detective Eric Meyer (**Detective Meyer**) testified regarding Kagramany, and Detective Larry Bammer (**Detective Bammer**), Special Agent Mitchell, and Sergeant Rafael Quintero (**Sergeant Quintero**) testified regarding Changryan.

27

As previously discussed, when a trial court denies a party's motion *in limine*, that party must object to the proffered evidence during trial to preserve the issue for appeal. Kobashigawa, 129 Hawai'i at 322, 300 P.3d at 588. The exception is when the ruling on the motion *in limine* is definitive. HRE 103(a). Here, the court's ruling on the request for a HRE Rule 104 hearing was not definitive; it specifically instructed counsel to request a hearing at a later point if they believed one was still necessary. When Detective Bammer, Special Agent Mitchell, Sergeant Quintero, and Detective Meyer testified, Changryan's counsel only objected and requested a HRE Rule 104 hearing with respect to Special Agent Mitchell's testimony. "As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal[.]" Moses, 102 Hawai'i at 456, 77 P.3d at 947. Thus, the issue of whether the trial court abused its discretion by neglecting to hold a HRE Rule 104 hearing is waived with respect to the testimony of the law enforcement witnesses except for Special Agent Mitchell.

With respect to Special Agent Mitchell's testimony, Changryan's counsel requested a HRE Rule 104 hearing when it appeared as though Special Agent Mitchell was about to identify Changryan in several photographs. However, the DPA then agreed to move on from the questions regarding the photographs so as to avoid the need for a HRE Rule 104 hearing and instead questioned Special Agent Mitchell about skimming devices instead. Thus, there was no need for a HRE Rule 104 hearing with respect to

Special Agent Mitchell's testimony. Accordingly, we conclude that this point of error lacks merit.

     E.   Law Enforcement's Identification of the Defendants

Defendants argue that the Circuit Court abused its discretion in allowing the State's law enforcement witnesses to testify that they were familiar and had prior contact with the Defendants, asserting that this testimony was irrelevant and inadmissible under HRE Rules 401 and 402, as well as inadmissible prior bad act evidence under HRE Rule 404(b). Defendants also argue that the Circuit Court abused its discretion in allowing the State's law enforcement witnesses to offer lay opinion testimony that the individuals in photographs and videos were Changryan and Kagramany.

First, the majority of these arguments were not preserved on appeal. Changryan's counsel raised objections in his oral motion *in limine* which Kagramany's counsel joined. The court did not reject the requests, but stated:

> I'll take under consideration the question about whether the [law enforcement] witnesses can testify. . . . I will just mention that . . . I am inclined, from what I've heard, to allow that testimony assuming that there is a sufficient foundation laid about the familiarity with the witness with the defendant.

Thus, this ruling was not definitive. To preserve their objections for appeal, counsel for the Defendants needed to raise their objections if and when the evidence at issue was offered during trial. HRE 103(a); <u>Kobashigawa</u>, 129 Hawaiʻi at 322, 300 P.3d at 588. No objections were made during the direct examinations of Detective Bammer or Sergeant Quintero. Additionally, no objections were made to Special Agent Mitchell's

in-court identifications of Changryan. As previously discussed, an objection was made to Special Agent Mitchell's identification of Changryan in photographs, but the State dropped that line of questioning.

With respect to Detective Meyer's testimony, during direct examination, defense counsel failed to object when Detective Meyer identified Kagramany in the courtroom, testified that he had prior contact with him and had the opportunity to view his physical appearance, and stated that he looked substantially the same as he did at the time of the prior contact. Thus, objections as to these areas of Detective Meyer's testimony (i.e. that they were evidence of prior "bad acts") were not preserved on appeal.

However, it appears that Kagramany preserved his objection to Detective Meyer's testimony identifying Kagramany in various photographs. During direct examination, after the DPA presented Detective Meyer with the State's Exhibit 2A and 27 and asked, "is the person depicted on page 3 of Exhibit 27, and the person depicted on page 1 of Exhibit 2A, is that the same person you've identified in the courtroom as Vardan Kagramanyan?", the objection to this question was that:

> they're basically almost using this witness like an expert witness to say that the photograph depicts a particular person. And you know, that's for the jury to decide. That's not for this — basically this lay person to say that that is a photo of the defendant. . . . It's up to the jury to decide whether or not that's the defendant in that photo. It's not [a] proper subject for this witness to testify to.

The Circuit Court overruled the objection. On appeal, Kagramany argues that "Det. Meyer's lay opinion was irrelevant

and unnecessary because the jury could make their own determination that Kagramany was the individual in the photos."

Generally, lay opinion testimony will be admissible "[a]s long as (1) the witness has personal knowledge of matter that forms the basis of the testimony; (2) the testimony is rationally based on the witness' perception; and (3) the opinion is 'helpful' to the jury (the principal test)." State v. Jenkins, 93 Hawai'i 87, 105, 997 P.2d 13, 31 (2000) (citation omitted). "In Hawaii, admission of opinion evidence is a matter within the discretion of the trial court, and only an abuse of that discretion can result in reversal." Tucker, 10 Haw. App. at 89, 861 P.2d at 46 (citation omitted).

On appeal, Kangramany does not appear to contest Detective Meyer's personal knowledge or whether his testimony was rationally based on his perception. Rather, he contends that the testimony was not helpful to the jury. The Ninth Circuit Court of Appeals has held that, in situations such as these where a lay witness is asked to identify a defendant in a photograph, generally, such testimony is limited to situations where there is reason to believe that the witness is more likely to correctly identify the defendant than the jury. United States v. LaPierre, 998 F.2d 1460, 1465 (9th Cir. 1993).

We acknowledge that it is difficult to determine whether Detective Meyer's identification of Kagramany was helpful to the jury, but we cannot conclude that the Circuit Court abused its discretion in allowing it. Exhibit 2A, which had been entered into evidence during the testimony of former Island

Colony Hotel security officer Duwayne Freeman (**Freeman**), consisted of four still images from security footage inside an Island Colony Hotel elevator on September 10, 2010. The man in the images wearing a white shirt with black lettering was purportedly Kagramany. Exhibit 27, described as "[p]hotos at Island Colony Hotel, hotel elevator, and Aloha Island Mini Mart gas station" was not entered into evidence and does not appear in the record on appeal, making it difficult to determine how the Defendant(s) were depicted in these images.

In any case, we conclude that even if Detective Meyer's testimony should have been precluded, its admission was harmless error under the circumstances of this case. The import of his testimony was that the person seen in the surveillance footage in the Island Colony elevator and the Aloha Island gas station[24] was Kagramany. In his opening brief, Kagramany states that he has never denied that he was at the hotel or the gas stations. Thus, Detective Meyer's identification testimony could not have prejudiced Kagramany. And, as discussed above, other witnesses identified Kagramany in Exhibit 2A and there was substantial evidence to uphold his conviction. Accordingly, we conclude that any error in allowing Detective Meyer to identify Kagramany in Exhibits 2A and 27 was harmless beyond a reasonable doubt and does not warrant a reversal of his conviction. State v. Machado, 109 Hawai'i 445, 452, 127 P.3d 941, 948 (2006).

---

[24] Based on the trial testimony, the location depicted in Exhibit 27 was apparently the Kapahulu Aloha Island gas station.

F.    The Alleged Prosecutorial Misconduct

Defendants argue that the DPA's comments during closing argument constituted prosecutorial misconduct, asserting that the DPA:  (1) impermissibly shifted the burden of proof to the defense by stating that there was no evidence that Kagramany had not possessed any confidential personal information or proceeds from the alleged offense; (2) misstated the law on accomplice liability by telling the jury that being guilty as an accomplice meant either Changryan "was in on it or was helping"; and (3) improperly told the jury that they could save themselves time if they found Defendants guilty of one or more of the other offenses.  "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [appellate courts] consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant."  Agrabante, 73 Haw. at 198, 830 P.2d at 502 (citations omitted).

The first instance of alleged prosecutorial misconduct occurred when the DPA stated that there was no evidence that Kagramany had not possessed any confidential personal information or proceeds from the alleged offense.  Specifically, the following exchange took place during rebuttal after Kagramany's counsel stated in closing argument that there was no evidence that Kagramany "got any money" or "had confidential personal information":

> [DPA:] Information, well, [Kagramany's Counsel]
> says, well, how do we know Kagramany had information?
> Did anyone say he didn't have information? Who said he
> didn't have information? There's —

> [Kagramany's Counsel:] Your Honor, I object to that.
>
> [DPA:] -- no evidence of that.
>
> [Kagramany's Counsel:] That's clearly burden shifting on to the defense.
>
> THE COURT: All right. Your objection is overruled.
> You can proceed.
>
> [DPA:] Did anyone say he didn't get money? We don't know what happened to all of that $157,000. But we do know that those two guys went to L.A. right after all this skimming occurred, and that all the unauthorized ATM transactions occurred where they're from. What's the odds that he didn't get money? Zero. So there's no evidence he didn't get money.

First, the "nature of the alleged misconduct" was not egregious burden-shifting, rather the DPA was attempting to respond to the argument made in Kagramany's closing argument about there being no evidence of Kagramany having money or confidential personal information from the transactions. When viewed in context, the thrust of the DPA's comment was that it was unknown what happened to the money and personal information, but that the circumstantial evidence pointed to Kagramany's guilt.

Second, although there was no immediate curative instruction, as Kagramany's objection to the DPA's "no evidence" comment was overruled, the Circuit Court gave the jury general instructions prior to the closing arguments that would have cured any implication that Kagramany had a burden of proof. Juries are presumed to follow the court's instructions. See Knight, 80 Hawai'i at 327, 909 P.2d at 1142.

Finally, the evidence that Kagramany committed Accomplice to Identity Theft in the First Degree was strong, as there was a large amount of circumstantial evidence pointing to

his guilt. Kagramany was seen on surveillance footage with the white United van at multiple Aloha Island gas station locations, which were the "points of compromise" where the "skimming" operation took place, including surveillance showing the van making three stops at two different Aloha Island stations on the same night within a span of about three hours and going to two different pumps at one station, and positioning the van at pumps with the double side doors open to the pumps. This suspicious activity occurred right around the time that the banks and credit unions were receiving multiple complaints of the unauthorized ATM withdrawals. Kagramany was also associated with Changryan and the United vans by Island Colony Hotel employees, as well as through his flight records. Accordingly, we conclude that the DPA's "no evidence" comment here does not constitute reversible error.

The second instance of alleged prosecutorial misconduct, asserted by Changryan, purportedly occurred when the DPA told the jury that being guilty as an accomplice meant either Kagramany "was in on it and was helping." Specifically, the DPA said:

> When is a person legally accountable? As the second sentence says, when they're an accomplice. If they're an accomplice, they're legally accountable for the other person's conduct. When are they an accomplice? That's the instruction that the Court read to you. They're an accomplice if, with the intent to promote or facilitate the commission of a crime, they aid the other person in the planning or committing of it. Okay.
>
> So for Mr. Kagramany, just ask: Was he helping Changryan? Was he aiding Changryan? If your answer is yes, Kagramany was in on it and was helping, then Kagramany is guilty as an accomplice as well as for committing identity theft.

However, as is clear from the argument, the DPA was

referring only to Kagramany when making this comment about accomplice liability; thus, Changryan does not have standing to challenge this alleged misconduct on Kagramany's behalf because he did not demonstrate that he was actually "aggrieved by the ruling." See Abaya v. Mantell, 112 Hawai'i 176, 181, 145 P.3d 719, 724 (2006) (explaining the requirements of standing to appeal); McCully Assocs. v. Ten Grand Assocs., No. 30114, 2013 WL 1789403 at *1 (App. Apr. 25, 2013) (explaining that third-party defendant/appellant did not have standing to oppose the court's ruling because he "has not established that he is affected or prejudiced" by the court's award).

Moreover, an examination of the comment "was in on it and was helping" does not constitute prosecutorial misconduct because, in addition to Kagramany's counsel also using the term "help" in reference to accomplice liability, the phrase "was in on it *and* was helping" (emphasis added) was simply another way of explaining the term "aid," which was not defined for the jury. See Webster's Third New International Dictionary 44 (1981) (defining "aid" as "to give help or support to"); see also State v. Cooley, 123 Hawai'i 293, 296, 233 P.3d 713, 716 (App. 2010) ("Ordinary meanings are attached to terms not given a statutory definition and one may resort to legal or other well accepted dictionaries as one way to determine the ordinary meanings of certain terms.") (citation, internal quotation marks, and brackets omitted). Therefore, the DPA's comments pertaining to accomplice liability here were not improper.

Finally, Defendants allege prosecutorial misconduct

NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

occurred when the DPA told the jury that they could save themselves time if they found Defendants guilty of one or more of the other offenses. This comment arose within the context of the following part of the DPA's closing argument:

> Now, the next instruction I want to talk about is real important, real, real important, on page 42. If you look at the first sentence on page 42, it says: If and only if you find the Defendant Changryan not guilty in 1 and 2 or you're unable to reach a unanimous verdict, then you must consider the criminal conspiracy in Count 7. Okay.
>
> What does that mean? If you find Changryan guilty in Count 1 or 2 or both, you do not have to decide Count 7. Okay? You can save yourself a lot of time if you find him guilty of Count 1 or 2 or both. You're not going to worry about Count 7 for Changryan.
>
> And it's the same thing for Kagramany. If you find him guilty of Count 3 and 4, you don't have to decide Count 7 and answer all of those special interrogatories that the Court read off earlier. In this case, both of these guys are guilty of I.D. theft 1 and accomplice to I.D. theft, based on the totality of the evidence that's been presented in this case.

Counsel for the Defendants did not object to this part of the closing argument. Thus, we must determine whether the DPA's remarks amounted to plain error which affected the substantial rights of the Defendants. State v. Klinge, 92 Hawai'i 577, 592, 994 P.2d 509, 524 (2000). We conclude that it does not.

We take a dim view of the DPA's statement that "[y]ou can save yourself a lot of time if you find him guilty of Count 1 or 2 or both." Notwithstanding that, when viewed in context, the DPA's comment might be considered a colloquial manner of stating the fact that the jury would not have to address Count 7 if they found Changryan guilty of Count 1 or 2, or if they found Kagramany guilty of Count 3 or 4, the statement about saving time should not have been made. Even assuming, *arguendo,* that the

37

DPA's statement was improper, we cannot conclude that it constitutes plain error. After closing arguments, the Circuit Court advised the jury to "take such time as you feel is necessary for your deliberations," and there is no basis whatsoever to believe that the jury may have found the Defendants guilty on Counts 1 through 4 in order to save time by not addressing Count 7. Additionally, we note that the jury was issued a general instruction before closing arguments stating that it was to "consider only the evidence which has been presented to you in this case and such inferences therefrom as may be justified by reason and common sense." As the jury is presumed to follow the court's instruction, any improper implication about saving time during jury deliberations was cured. See Knight, 80 Hawai'i at 327, 909 P.2d at 1142. Finally, as discussed above, the circumstantial evidence against Changryan and Kagramany was strong. Therefore, we cannot conclude that any error in allowing this comment contributed to the conviction or that the Defendants' substantial rights were affected. See Klinge, 92 Hawai'i at 593, 994 P.2d at 525 ("in light of the nature of the prosecutor's statement, the failure of defense counsel to object, and the strength of the evidence against [the defendant], we hold that any error with regard to [the prosecutor's contested statement] did not prejudicially affect [the defendant's] substantial rights").

V.    CONCLUSION

For these reasons, the Circuit Court's June 7, 2013 Judgment of Conviction and Sentence is affirmed.

DATED: Honolulu, Hawaiʻi, August 24, 2015.

On the briefs:

Jeffrey A. Hawk
(Hawk Sing & Ignacio)
for Defendant-Appellant and
Co-Defendant-Appellant

Sonja P. McCullen
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee in
No. 13-0001719

Brandon H. Ito
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee in
No. 13-0002367

Presiding Judge

Associate Judge

Associate Judge